# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

SANDRA GRESHAM,        )
                                 )

      **Plaintiff,**          )
                                 )

    **v.**                     )     **Case number 4:03cv1001 TCM**
                                 )

JO ANNE B. BARNHART,    )
Commissioner of Social Security,   )
                               )

      **Defendant.**        )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405 (g) for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying Sandra Gresham's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433. Ms. Gresham ("Plaintiff") has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer.[1]

### Procedural History

Plaintiff applied in April 2001 for DIB, alleging she was unable to work after December 16, 1998, because of depression, anxiety, arthritis, cervical spondylitis, and right shoulder strain. (R. at 76-79.)[2] After her application was denied, a hearing was held, at

---

[1]The case is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

Plaintiff's request, in March 2002 before Administrative Law Judge ("ALJ") Craig Ellis. (Id. at 30, 52-55, 428-56.) The ALJ determined that Plaintiff was not under a disability at any time on or before the date of his decision, and denied her application. (Id. at 21-29.) After making additional evidence part of the record, see pages 19, 20, and 21, below, the Appeals Council denied Plaintiff's request for review of that decision, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 3-5.)

### Testimony Before the ALJ

Plaintiff, represented by a non-attorney, and Gary Weimholt, a vocational expert ("VE"),[3] testified at the administrative hearing. Plaintiff's husband was present but did not testify.

Plaintiff testified she was born on November 7, 1954, and was then 47 years old. (Id. at 432.) She was 5 feet 4 inches tall and weighed approximately 225 pounds. (Id. at 433.) She had completed the tenth grade, but had not obtained a General Equivalency Degree ("GED"). (Id.) She lived with her husband, who received disability benefits. (Id. at 432.) She was currently receiving disability benefits from her previous employer, Associated Rehab. (Id. at 434-35.)

She worked as a rehabilitation technician for Associated Rehab for more than nine years. (Id. at 435.) She walked and exercised patients. (Id.) She was no longer able to work there after she slipped and fell at a convenience store when on her lunch break. (Id.) She injured her rotator cuff in that accident. (Id. at 436.) She had had two surgeries and

_____

[3]Plaintiff did not object to Mr. Weimholt's qualifications as a VE.

approximately one year of physical therapy.  (Id. at 441.)  The therapy had partially helped, but her pain continued after the sessions ended.  (Id. at 442.)  In addition to the rotator cuff surgery, she had had surgery on her left knee.  (Id. at 443.)  Although her knee had not had to be drained since then, it continued to swell.  (Id.)  Additionally, her doctor had told her she had osteoarthritis in her spine and had sent her to a spine specialist.  (Id.)  She also had a bulging disk for which her doctor had recommended cortisone injections.  (Id.)  She elected to consult a chiropractor instead.  (Id.)

Plaintiff testified that she did not have the ability to do a sit-down job because of spasms in her legs.  (Id. at 436-37.)  She also had spasms in her back.  (Id. at 447.)  She had problems walking on stairs because her knee "catches and hurts."  (Id. at 444-45.)  She was sometimes numb in her legs and arms.  (Id. at 447.)  She could not lift her right arm above her shoulder.  (Id.)  She was right-handed and could not write for longer than five minutes.  (Id. at 448.)  She could walk no farther than two blocks, could stand for no longer than one hour, and could sit for no longer than 30 minutes.  (Id. at 446-47.)  She was tired daily and had problems sleeping at night.  (Id. at 446.)  She had to take naps during the day because she only slept for three to four hours at night.  (Id.)  And, she sometimes had difficulty concentrating.  (Id. at 448.)

Plaintiff did her laundry.  (Id. at 438.)  She went grocery shopping every two weeks, but could lift nothing heavier than a gallon of milk.  (Id. at 440.)  She had traveled to Ohio to visit her daughter in December; her husband drove.  (Id. at 440.)  They had to take

frequent breaks, however, because she could not sit for long.  (Id. at 445.)  She sometimes

had to lie down in the back of their van.  (Id.)

She was taking Prozac, prescribed by her family practitioner for depression.  (Id. at

440-41.)  It generally is effective.  (Id. at 441.)

Mr. Weimholt testified as a VE.  He described Plaintiff's previous job as a medium

physically demanding, semi-skilled job.  (Id. at 450.)  The ALJ asked him the following

hypothetical question:

> Q. . . . I'd like you to assume we have a hypothetical individual, with the age,
> education, and the work experience of the claimant, who could only, sit, stand,
> and walk, for a total of four hours, over the course of an eight hour workday.
> Who cannot engage in repetitive grasping, pushing, pulling, or fine
> manipulation.  Who cannot lift and carry over ten pounds.  Who could rarely
> squat.  The total restriction of working around unprotected heights, be around
> moving machinery, temperature extremes, operating motor vehicles, and
> exposure to dust, fumes, and gases.  That will be RFC #1, and that's based
> upon the form completed by Dr. Galbress [sic].  Okay, a second RFC I'd like
> you to assume a hypothetical individual with the age, education, and the work
> experience of the claimant.  Can sit for about six hours over the course of an
> eight hour workday, with usual breaks.  Can stand or walk for about two
> hours, over the course of an eight hour workday.  Cannot lift and carry over
> ten pounds.  With the right upper extremity, cannot work overhead, or above
> shoulder level.  Cannot crawl, can occasionally engage in other posterioral
> activities.  Must avoid concentrated exposure to vibrations of the body, and to
> workplace hazards.  That will be RFC # 2.  Okay, would a hypothetical
> individual with the age, education, and work experience of the claimant, with
> RFC # 1, be able to do any past work?
>
> A.  No, sir.
>
> Q.  Can you cite any work which could be done?
>
> A.  When I consider that the total of sitting, standing and walking would be
> four hours, or less, than a customary workday of approximately six and a half,
> to eight hours a day.  My opinion is no.

Q. Okay. With RFC #2, could a hypothetical individual with the age, education, and work experience of Ms. Gresham, perform any past work?

A. No, sir.

Q. Can you cite other work which could be performed?

A. Your Honor, in my opinion there are some of the cashiering jobs, such as a cafeteria cashier, and also some cashiers who receive and take fast food orders, from like drive-thru windows. And there are approximately 2,500 of those jobs in the State economy, that job is classified, according to the DOT, as a light job, but in these circumstances, there would be no lifting greater than ten pounds, and the job does allow for the sitting, of up to six hours a day. There would be some information clerk jobs, there are approximately 500 of these. These can be found at museums, entertainment centers, theatres, and also some commercial establishments, and hospitals. And that job would also be classified according to the DOT, as a light job, but in the circumstances I'm referring to, and the numbers of jobs I'm referring to, it could be performed within this hypothetical.

Q. Okay. So how many fall within this range, within these restrictions.

A. 500 of those jobs. . . .

(Id. at 450-52.) In response to questions by Plaintiff's representative, Mr. Weimholt further testified that a habit of sporadically dozing off in the workplace would be unacceptable. (Id. at 453-54.) It would also be unacceptable if the employee had to take two or three days off each month, in addition to regularly-scheduled days off. (Id. at 454.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed by Plaintiff as part of the application process; documents generated pursuant to that record; medical records; and medical evaluation reports.

As part of the application process, Plaintiff completed a claimant questionnaire. She reported that she had difficulties if she lay too long in one place, held her grandchildren too long, or did too much housework. (<u>Id.</u> at 123.) She had trouble caring about anything due to her depression. (<u>Id.</u>) She also had difficulties stirring food, lifting pots, or reaching things on top shelves. (<u>Id.</u> at 124.) She was able to, if she took it slowly and took breaks, vacuum, sweep, dust, and do a small amount of dishes. (<u>Id.</u>) She took Prozac and Celebrex. (<u>Id.</u> at 123.) She was able to attend functions at the VFW Hall, which she lacked the time to attend before, and to take care of plants. (<u>Id.</u> at 125.) She could take short walks with her grandchildren, although she could no longer ride bicycles with them as before. (<u>Id.</u>) Her family said she cried a lot and was forgetful. (<u>Id.</u> at 126.)

In a separate, pain questionnaire, Plaintiff described her pain as an ache most of the time and a sharp pain if she did an unusual movement. (<u>Id.</u> at 127.) The pain was dull if she overdid things or when her back was tired and throbbing. (<u>Id.</u>) Cleaning the house, stretching, pulling, reaching, and lifting usually caused pain. (<u>Id.</u>) Her husband reported in a daily activities questionnaire that Plaintiff was hard to get along with and had difficulties lifting and doing housework. (<u>Id.</u> at 128.) She would not go to bed, but would sleep all day. (<u>Id.</u>) A friend and former coworker reported that Plaintiff could not lift anything over 10 to 15 pounds and had difficulty walking any distance and doing any housework. (<u>Id.</u> at 129.) She also described Plaintiff as a very pleasant person and a hard worker. (<u>Id.</u>)

An earnings report generated for Plaintiff listed income for the years from 1972 to 1999. (<u>Id.</u> at 65-66.) In 1999, her annual income was $8,947.82. (<u>Id.</u> at 66.) In four of the

five previous years, her annual income had exceeded $20,000.00. (Id. at 65-66.) In the two years preceding those five, her income exceeded $18,500.00. (Id. at 65.)

Plaintiff's relevant medical records begin with the treatment of her right shoulder after she fell at a convenience store during a lunch break on April 30, 1998. (Id. at 330.) A family nurse practitioner, Amy Fisher, R.N., F.N.P., at the Rolla Family Practice Clinic (the "Clinic") examined Plaintiff on May 1 and diagnosed her with a shoulder strain or possible rotator cuff tear. (Id. at 362.) Two weeks later, Plaintiff's shoulder continued to ache. (Id. at 361.) She was referred to physical therapy for range of movement and strengthening exercises. (Id. at 331, 361.) Consequently, Plaintiff began physical therapy on May 18. (Id. at 326-27.)

Two days later, she reported that the constant aching pain in her shoulder was a five to six on a scale of one to ten with repetitive movements and an eight or nine with certain unguarded movements. (Id. at 325.) She had pain on palpation during a massage. (Id.) After she returned from vacation on June 1, she reported that the pain stayed the same during her trip. (Id.) It increased, however, with certain movements or in prolonged positions. (Id.) She was unable to do repetitive movements. (Id.) Plaintiff continued to report soreness during the next three sessions. (Id. at 322-24.)

On June 10, Plaintiff returned to the Clinic after several weeks of physical therapy. (Id. at 357.) Her right shoulder continued to ache at night and to be painful if she did any overhead lifting. (Id.) Her condition was described as "improving." (Id.) At physical therapy the next day, she reported a nominal improvement in the pain. (Id. at 321.) The day

after, she stated that she was feeling a lot better, had been able to work in her garden, and had slept well. (Id.) Her shoulder was still notably tender on massage. (Id.) At the June 15 session, Plaintiff complained of soreness due to weekend activities. (Id. at 319.) Two days later, she was feeling better. (Id.) She continued to feel better at the June 18 and 22 sessions; however, on June 24 she reported that she was feeling sore. (Id. at 317-18.) Again, she was feeling better at the next four sessions. (Id. at 315-16.) At the July 8 session, she stated that she was generally feeling better but was still having trouble sleeping. (Id. at 314.) On July 10, her pain was less although her activity level was greater. (Id.) Two therapists wrote Ms. Fisher that day to report that Plaintiff had made improvements with her strength and range of movement, although her pain level remained abnormally high. (Id. at 313.) Plaintiff thought there was no significant change. (Id.) The therapists recommended further medical testing because of the reported high pain level. (Id.)

On July 12, Plaintiff was given a script for three physical therapy sessions a week for four weeks, each session to include ice, massage, and electrical stimulation. (Id. at 312.) She was seen at the Clinic on July 15. (Id. at 358.) Her strength was described as good, but her shoulder was continuing to be occasionally painful. (Id.) The script was renewed in August.

On September 16, Ms. Fisher noted that Plaintiff was no longer making any progress in physical therapy. (Id. at 356.) She could not clean her house as well as before and could not do other things she wanted to. (Id.) She wanted a referral to a physician. (Id.) Consequently, an appointment with Timothy Galbraith, D.O., was made for her. (Id.)

On December 17, the day after her alleged disability onset date, she had arthroscopy surgery on her right shoulder. (Id. at 165.) The postoperative diagnosis was of osteoarthritis, rotator cuff tendinitis, and rotator cuff tear in her right shoulder. (Id.) The surgery was performed by Dr. Galbraith. (Id. at 170.)

A script for physical therapy was renewed in August, October, November, December, February 1999, March, April, and May. (Id. at 225, 236, 250, 262, 277, 282, 289, 303.) An additional script was written in October 1998 for no overhead lifting and light duties. (Id. at 290.) The December script added full passive range of motion exercises, and the February 1999 script added strengthening exercises. (Id. at 262, 277.) The May script was for a maintenance program. (Id. at 225.)

During the course of physical therapy, Plaintiff's shoulder pain, range of movement, and strength continued to improve, with occasional setbacks. (Id. at 211-22, 228-35, 237-49, 253-61, 264-76, 283-88, 291-96, 299-302, 306-10.) On January 19, Plaintiff had no pain and a full range of motion. (Id. at 345.) She reported that she was ready to go back to work. (Id.) On February 16, a physician's assistant reported that Plaintiff had forward flexion to 160°. (Id. at 344.) Plaintiff was encouraged to continue with physical therapy. (Id.) On March 16, Plaintiff had full range of motion. (Id. at 343.) She was released to return to work with a five-pound limit of lifting and no overhead lifting. (Id.)

That same day, the physical therapist wrote Dr. Galbraith, informing him that Plaintiff was progressing with therapy and "exhibiting excellent progress with all mobility and strength. [Plaintiff] with decline in pain consistently allowing increased functional activity

performance." (Id. at 251.)  Plaintiff exhibited a normal shoulder passive range, and a slightly limited active motion range.  (Id.)  She still had strength deficits, "preventing full functional independence."  (Id.)

At her April 16 examination by Dr. Galbraith, Plaintiff continued to have full range of motion, but was still "a little" weak with her scapular stabilizers.  (Id. at 342.)  She was released to return to work on light duty.  (Id.)  She was not to do any overhead lifting of anything heavier than five pounds.  (Id.)  On April 30, Plaintiff reported that work was going better, although she was still very tired.  (Id. at 232.)  The next week, she reported that her only problem at work was when she was having to work for a long time in cabinets at eye level.  (Id. at 231.)  Her functional daily activities at home and work were improving.  (Id.)

On May 14, Dr. Galbraith examined Plaintiff and continued her on light duty, increasing her weight limit to 25 pounds.  (Id. at 341.)  She was not to do any overhead lifting of anything weighing more than 25 pounds.  (Id.)  On May 28, she reported to the physical therapist that her shoulder gave her trouble if she did repetitious work.  (Id. at 219.)  On June 8, she was "doing really good," but was occasionally tired.  (Id. at 216.)

On June 25, the physical therapist completed a status report for Dr. Galbraith.  (Id. at 209-10.)  Plaintiff was within normal limits in her range of motion, function, and mobility.  (Id. at 209.)  She still had some weakness in her scapular musculature.  (Id. at 210.)  The therapist opined that Plaintiff's "only current limitation is endurance[.]"  (Id. at 209.)  Plaintiff was given a home exercise program for stretching and strengthening.  (Id. at 210.)

On July 30, seven moths after the surgery to repair her rotator cuff, Plaintiff was again examined by Dr. Galbraith.  (Id. at 334.)  He noted that she lacked approximately 10° of forward elevation and about 5° of internal rotation.  (Id.)  Her strength was improving, although she was still a little weak with overhead activity.  (Id.)  He assessed the partial permanent impairment of her right shoulder at 16°.  (Id.)

While still participating in physical therapy for her shoulder, on May 11, 1999, Plaintiff began physical therapy to treat a meniscal tear in her left knee.  (Id. at 205.)  On a screening form completed at the beginning of therapy, she reported that she also had arthritis and migraine headaches.  (Id. at 206.)  She was not taking any medications, and did not engage in any regular exercise.  (Id.)  Her pain was a five or six out of ten, with ten "being pain that requiring Emergency Room Care."  (Id. at 207.)  Her ability to dress herself and to do light housework was limited; her ability to groom and prepare meals was mildly limited.  (Id.)  Her goal was to get stronger.  (Id.)  To the therapist, she described the pain from the tear as constant, becoming sharp with movement.  (Id. at 204.)  At the third session, it was noted that Plaintiff continued to tolerate physical therapy well and was improving in her range of movement.  (Id. at 198.)  Three days later, she requested that she be instructed again on the use of a knee brace.  (Id. at 197.)  She was able to slightly increase the number of exercise repetitions without a corresponding increase in her symptoms.  (Id.)  Two sessions later, Plaintiff reported that her knee had been "pretty good," although the pain was aggravated if she sat in a certain position for too long.  (Id. at 195.)  She also noted that she was fatigued as a result of the current exercise program.  (Id.)  After another two sessions,

on June 1, Plaintiff reported that her knee was sore as a result of her working too much during the weekend.  (Id. at 193.)  On June 8, Plaintiff reported doing well unless she turned wrong or stayed in one position too long.  (Id. at 191.)  The mobility and strength in her left knee had improved; her pain and the swelling in her knee had decreased.  (Id.)  The next week, the strength in her knee continued to increase, although some pain remained.  (Id. at 190.)  Plaintiff had a migraine headache.  (Id.)

On June 25, at a follow-up appointment with Dr. Galbraith for her shoulder, Plaintiff complained of knee pain.  (Id. at 340.)  He noted that she had full range of movement in her shoulder and her strength was "coming along very well."  (Id.)  She still had some stiffness in the morning.  (Id.)  On exam, he could not find any weakness as compared to the opposite side.  (Id.)  She had sharp pain in her left knee with certain movements.  (Id.)  Dr. Galbraith opined that she had a meniscus tear.  (Id.)  He told Plaintiff there were two options, one was to continue with physical therapy and the other was arthroscopic surgery.  (Id.)  She replied that she would consider both and report back to him.  (Id.)

On July 13, Plaintiff reported to Dr. Galbraith that the pain had become progressively worse and could no longer be tolerated.  (Id. at 339.)  She described the pain as a "locking type pain," which caused her knee to lock in a certain position.  (Id.)  Her medical history included surgery on her right foot, laser surgery, and migraine headaches.  (Id.)  A meniscus tear was diagnosed.  (Id.)  Plaintiff was given the options of conservative treatment or arthroscopic surgery.  (Id.)  She choose the latter.  (Id.)

On July 22, Plaintiff underwent arthroscopic surgery to repair the medial meniscus tear in her left knee and an articular debridement to address the degenerative joint disease in her medial femoral condyle, trochlear groove, and patella. (<u>Id.</u> at 336.) There were no complications. (<u>Id.</u> at 337.) On July 30, the sutures from her knee surgery were removed. (<u>Id.</u> at 335.) Plaintiff was to return to physical therapy to strengthen her quadriceps. (<u>Id.</u>)

Consequently, Plaintiff resumed physical therapy for her knee. (<u>Id.</u> at 186.) This time, she rated her pain as a three on a scale of one to ten. (<u>Id.</u> at 185.) She was then taking pain medication. (<u>Id.</u> at 184.) She reported that the pain was constant and became sharp with movement. (<u>Id.</u> at 181.) She could walk short distances, not long, and had difficulty walking on uneven surfaces. (<u>Id.</u>) After two sessions, Plaintiff reported feeling better. (<u>Id.</u> at 179.) Her knee was still swollen and was warm to the touch. (<u>Id.</u>) At the next session, August 12, Plaintiff continued to improve. (<u>Id.</u> at 178.) The range of movement and strength in her knee had increased. (<u>Id.</u>)

The next day, August 13, the physical therapist issued a status report to Dr. Galbraith, describing Plaintiff's attitude as very cooperative and motivated and reporting that she had made excellent progress and had improved her range of motion by 10% and her strength by 25%. (<u>Id.</u> at 177.) The recommendation was that she continue with physical therapy. (<u>Id.</u>) That same day, Plaintiff was examined by Dr. Galbraith. (<u>Id.</u> at 333.) Plaintiff reported that her knee was improving but was not 100%. (<u>Id.</u>) She had full extension and was able to flex her knee to 100°. (<u>Id.</u>) Although her quadriceps strength was weak, it had improved since her last visit. (<u>Id.</u>)

Plaintiff did continue with physical therapy, for two more weeks. (<u>Id.</u> at 172-75.) At the next-to-last session, Plaintiff reported that she felt fine "most of the time" unless she walked a lot. (<u>Id.</u> at 173.) It still hurt if she went up or down steps and if she sat too long. (<u>Id.</u>) At the last session, on August 31, she was able to flex her left knee 127°. (<u>Id.</u> at 172.)

On September 10, Plaintiff returned to Dr. Galbraith for a follow-up visit. (<u>Id.</u> at 332.) He observed that her quad strength was "coming along very well." (<u>Id.</u>) She had full range of motion and was able to squat. (<u>Id.</u>) There was no swelling. (<u>Id.</u>)

The next relevant medical record is of a May 2000 visit by Plaintiff to the Clinic. She complained of being depressed and not able to work. (<u>Id.</u> at 351.) Her shoulder surgery had "healed as she had hoped." (<u>Id.</u>) She was prescribed Prozac and was to follow up in two months. (<u>Id.</u> at 350.) Her complaints at her next, September visit were of cough and head congestion. (<u>Id.</u> at 349.) She was taking the Prozac. (<u>Id.</u>)

The next visit is in February 2001. (<u>Id.</u> at 348.) She complained of right shoulder pain. (<u>Id.</u>) She was not doing any exercises and was not taking any pain medication. (<u>Id.</u>) She had no specific area of tenderness over her right shoulder, but did have a good range of motion. (<u>Id.</u>) She did not think the dosage of Prozac was adequate. (<u>Id.</u>) The nurse practitioner recommended she resume the shoulder exercises and use ice at the end of the day when she had problems. (<u>Id.</u>) Her dosage of Prozac was doubled, from ten milligrams to twenty. (<u>Id.</u>) At a March visit for poison ivy, Plaintiff did not complain of pain or depression. (<u>Id.</u> at 347.)

At her "well woman" examination in June, Plaintiff was described as generally "doing fairly well." (Id. at 377.)  She did complain of fatigue.  (Id.)  At her next, and last included, visit, Plaintiff complained of right elbow pain.  (Id. at 376.)  She also reported that she had been unable to lift anything or raise her arms overhead since her shoulder surgery two and one-half years before.  (Id.)  She requested that the doctor, Dr. Felts, complete a form asking for specific disability information.  (Id.)  Dr. Felts deferred, informing her that the form should be filled out by her orthopedic surgeon.  (Id.)

In October 2001, Plaintiff complained to Dr. Galbraith of pain in her neck going down both arms.  (Id. at 393.)  A magnetic reasoning imaging ("MRI") of her cervical spine was performed the next day.  (Id. at 394, 406.)  The impression was of mild to moderate spondylosis.  (Id.)  The MRI also revealed a mild annular bulge at C3-4, an annular bulge at C5-6, and a right paracentral disc protrusion at C6-7.  (Id.)  Dr. Galbraith reviewed the MRI with Plaintiff on November 9.  (Id. at 392.)  He reported that "she has a lot of cervical spondylosis and her symptoms are in her neck because she has pain going down both arms." (Id.)  She was also having sensory loss and pain in both arms.  (Id.)

In December, Dr. Galbraith completed the disability form.[4]  (Id. at 386-91.)  He opined that Plaintiff could, in an eight hour day, sit, stand, or walk for less than two hours. (Id. at 386.)  She could rarely lift up to nine pounds, and never lift ten pounds or more.  (Id.) She could not carry anything heavier than five pounds.  (Id. at 387.)  She could rarely squat,

---

[4]A report from a spine specialist, see page 19, below, was faxed to Dr. Galbraith in November 2001.  (Id. at 405.)

and never bend, crawl, climb, or reach above shoulder level. (Id.) Her fatigue and pain had a marked limitation on her ability to function. (Id.) His diagnosis was cervical spondylosis pain in her neck and down both arms. (Id. at 388.) Emotional factors did not contribute to her symptoms and functional limitations. (Id.) He further opined that she was likely to be absent from work for reasons related to her impairments more than three times a month and would need to take unscheduled breaks during a work shift. (Id. at 389.) Pain would often affect her ability to concentrate and pay attention. (Id.) Additionally, she was unable to turn her head, reach, stretch, or lift. (Id. at 391.) Her impairments were expected to last at least 12 months. (Id. at 389.)

Pursuant to her DIB application, Ellvan D. Markley, a counselor for the State of Missouri Disability Determinations System, assessed Plaintiff's physical residual functional capacity in July 2001. (Id. at 103-10.) Citing her medical records, he concluded she had the capacity to occasionally lift twenty pounds, frequently lift ten pounds, and stand, sit, or walk about six hours in an eight-hour work day. (Id. at 104.) She was limited to occasional balancing, crawling, and reaching. (Id. at 106-07.) She should avoid concentrated exposure to fumes, odors, dusts, gases, and hazards. (Id. at 108.) Mr. Markley found Plaintiff's allegations of pain to be only partially credible, noting that she went to the VFW every Tuesday, Wal-Mart once or twice a week, and to her son's house once or twice a week. (Id. at 109.) This assessment was based on a diagnosis of post right rotator cuff tendinitis and tear repair and post left medial meniscus tear repair. (Id. at 103.)

That same month, Plaintiff was evaluated by Brian Cysewski, Ph.D. (Id. at 370-73.) He described Plaintiff as presenting "herself in somewhat of an inconsistent manner." (Id. at 370.) She reported that she had three problems that interfered with her ability to work: (1) pain in her right shoulder, radiating across her back to her left shoulder and then into her neck; (2) arthritis in both knees and swelling in her left knee; and (3) depression, caused from being unable to do the chores she previously had done. (Id.) After a mental status evaluation, Dr. Cysewski concluded that Plaintiff had dysthymia[5] and a Global Assessment of Functioning[6] ("GAF") score of 75. (Id. at 371-73.)

Plaintiff underwent another psychological evaluation in May 2002. (Id. at 396-402.) Kenneth R. MacDonald, Ph.D., noted that Plaintiff's primary complaints related to her shoulder injury. (Id. at 396.) She reported that her pace and persistence were a problem because of her physical problems, not because of depression. (Id. at 397.) Her memory was not impaired; her mental control excellent. (Id.) There was no evidence of a marked

---

[5]"Dysthymia" is defined as "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or over-eating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." Stedman's Medical Dictionary 536 (26th ed. 1995).

[6]"According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003). See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)). A GAF score of 71 to 80 is defined as: "If symptoms are present, they are transient and expectable reactions to pyscho-social stressors (e.g. difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning . . ." Manual at 34.

restriction in her daily activities. (Id. at 398.) Any restriction in functioning would be secondary to her physical problems, not to her depression. (Id.) Tests indicated that there was a "mild weakness" in her ability to cope with external stress. (Id.) Tests also indicated a depressive lifestyle consistent with Plaintiff's reaction to chronic pain. (Id.) The depression was not, in and of itself, disabling. (Id. at 398, 400-01.) The source of this pain was her shoulders. (Id. at 398.) Dr. MacDonald diagnosed dysthymia and assessed her GAF at 60.[7] (Id. at 399.)

## The ALJ's Decision

The ALJ concluded that Plaintiff had dysthymia, cervical spondylitis, right shoulder strain and was status-post right rotator cuff and left knee arthroscopic surgery, but was not disabled within the meaning of the Act. (Id. at 28.) When reaching this conclusion, the ALJ found her allegations of disabling symptoms not to be credible on the grounds (a) she was, according to Dr. Galbraith's notes of September 1999, able to squat and had full range of motion in her left knee; (b) she was, according to the physical therapist's notes of August 1999, able to walk without limitation or significant pain; (c) she was non-compliant with her home exercises; (d) she presented herself in an inconsistent manner to Dr. Cysewski; (e) she failed to consult a spine specialist, as recommended by Dr. Galbraith; (f) she was not prescribed any strong pain medication; (g) she was able to travel, for instance, she traveled

---

[7]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders at 34.

to Ohio to visit her daughter and drove 100 miles to the doctor; (h) she did not take any psychiatric medication; and (i) she did not seek any continuing medical care for her shoulder or knee problems. (Id. at 23-25.) The ALJ also considered the lack of any long term, significant, and adverse mental or physical limitations imposed on Plaintiff by any of her doctors. (Id. at 26.) He discounted the December report of Dr. Galbraith on the grounds that it "was done for legal purposes, as opposed to medical purposes," and was unsupported by the medical evidence. (Id.) The ALJ further noted that Plaintiff had returned to work in April 1999 for three months at a substantially gainful activity level and was found to have no limitations within two months of surgery on her left knee. (Id. at 26.)

She had, the ALJ found, the residual functional capacity to perform work except for that requiring that she lift or carry over ten pounds, stand or walk for more than two hours in an eight-hour day, work above her shoulder, or crawl. (Id. at 27.) She should also avoid work that required more than occasional stooping and bending or exposure to vibrations and work place hazards. (Id.) These limitations precluded her return to her past relevant work as a rehabilitation technician. (Id.) They did not, however, preclude her from performing the work outlined by the VE, specifically cafeteria and fast food cashier jobs, clerk jobs, or electronic inspection/assembly jobs. (Id.)

### Additional Medical Records Before the Appeals Council

The medical records of Viswantha Kharidi, M.D., and of Curtis S. Cox, M.D., were submitted to the Appeals Council after the ALJ's adverse decision.

Dr. Cox, a spine specialist, examined Plaintiff on November 26, 2001. (Id. at 404-05.) He diagnosed her with neck and arm pain from cervical spondylosis and recommended a series of cervical epidural steroid injections. (Id. at 405.)

Plaintiff began consulting Dr. Kharidi with the Regional Neurology Center in October 2002. (Id. at 408-10.) Her medical history included osteoarthritis in her spine, thyroid dysfunction, intermittent headaches and dizziness, and bladder and urinary control problems. (Id. at 408.) She had aches and spasms in her muscles that were progressively getting worse. (Id.) Her medications then included, among others, Vicodin, Celebrex, and OxyContin. (Id.) She had full range of movement in her cervical muscles, no tenderness, no spasms, and no pain on straight leg raising. (Id. at 409.) Her gait and station were normal and symmetrical; her muscle tone was normal; and no Tinel's sign[8] was present. (Id.) Dr. Kharidi diagnosed her with myofascial syndrome,[9] scheduled her for an MRI of her brain, and prescribed Imipramine. (Id. at 410.)

An MRI revealed cysts and an inflammatory disease in her sinus. (Id. at 412, 425-46.) A nerve conduction study revealed cervical radiculopathy related changes. (Id. at 412, 417.) Thus, on October 28, Plaintiff was additionally diagnosed with cervical radiculopathy and

---

[8]A Tinel's sign is "[a] tingling sensation at the end of a limb produced by tapping the nerve at a site of compression or injury." J.E. Scmidt, M.D. Attorney's Dictionary of Medicine T-140 (1999).

[9]Myofascial pain syndrome, also known as fibromyalgia, is characterized by "achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft-tissue structures." Merck Manual 1369 (16 ed. 1992). It occurs mainly in females and "may be induced or intensified by physical or mental stress, poor sleep, trauma, exposure to dampness or cold, and occasionally by a systemic, usually rheumatic, disorder." Id. at 1370.

was scheduled for an MRI of her cervical spine. (Id. at 412.) This MRI revealed arthritis changes in her cervical spine. (Id. at 413, 427.) At the next, November 11, visit, Plaintiff was to be started on physical therapy. (Id. at 414.) She was also given a transcutaneous electrical nerve stimulator ("TENS") unit for her neck and back. (Id.) On December 17, Plaintiff presented to Dr. Kharidi with an additional problem – she had felt a shock from her elbow to the tips of her fingers when she tried to pick up something with her left hand. (Id. at 415.) She was reportedly doing well on the Imipramine. (Id. at 416.) Her medications also included Allegra, Celebrex, Detrol, Fluoxetine, Glucosamine, Plaquenil, and Vicodin. (Id. at 415.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do h[er] previous work, but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 416.920, 404.1520. See also **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir.

2002); **Cox v. Apfel**, 160 F.3d 1203, 1206 (8th Cir. 1998). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 416.920(d), 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the

requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).  Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence.  **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added).  Some medical evidence must be included in the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alteration in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility regarding subjective pain complaints.  **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not

credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  And, although a claimant need not be reduced to life in front of the television in order to prove that pain precludes all productive activity, see **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir. 1996), "[t]he mere fact that working may cause pain or discomfort does not mandate a finding of disability," **Jones v. Chater**, 86 F.3d 823, 826 (8th Cir. 1996) (alteration added).

After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000) (same); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998) (same).  The decision of an ALJ who seriously considers, "but for good cause expressly discredits, a claimant's subjective complaints of pain, is not to be disturbed." **Haggard v. Apfel**, 175 F.3d 591, 594 (8th Cir. 1999).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.

**Banks**, 258 F.3d at 824.  See also 20 C.F.R. §§ 416.920(f), 404.1520(f).  The Commissioner may meet her burden by referring to the medical-vocational guidelines (the "Grids") or by eliciting testimony by a vocational expert.  **Pearsall**, 274 F.3d at 1219.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole."  **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937.  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  **Cox**, 160 F.3d at 1206-07.  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion.  **Dunahoo**, 241 F.3d at 1037; **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998).  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ ignored the opinion of her treating physician and surgeon,

Dr. Galbraith, when assessing her RFC. The Commissioner disagrees, arguing, in part, that Plaintiff's credibility was properly evaluated.

"'The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001) (quoting <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alterations in original). <u>Accord</u> **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995). The longer a claimant's physician has treated her and the more times, the more weight is given to that physician's opinion. 20 C.F.R. § 404.1527(d)(2)(i). And, the more knowledge a physician has about the claimant's impairments, the more weight is given to that physician's medical opinion. 20 C.F.R. § 404.1527(d)(2)(ii). The treatment provided and the "kinds and extent of examinations and testing the [physician] performed or ordered from specialists and independent laboratories" are relevant to the weight to be given the treating physician's opinion. <u>Id.</u> (alteration added). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight . . . will [be] give[n] that opinion." 20 C.F.R. § 404.1527(d)(2)(iii) (alterations added). "[T]he more consistent an opinion is with the record as a whole, the more weight . . . will [be] give[n] that opinion." 20 C.F.R. § 404.1527(d)(4) (alterations added). More weight is generally given "to the opinion of a

specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(d)(5).

It is undisputed that Dr. Galbraith consistently treated Plaintiff in 1999 and again beginning in October 2001.  It is also undisputed that he was knowledgeable about her shoulder, knee, and back problems.  The ALJ properly noted that Plaintiff had not received any treatment from Dr. Galbraith in 2000 and he had released her to return to work after her shoulder surgery.  The ALJ discounted Dr. Galbraith's December 2001 assessment of her restrictions, citing the motivation for the assessment being legal rather than medical and the inconsistency of that assessment with the record.

There is, however, evidence submitted to the Appeals Council and Plaintiff's testimony to call into question the ALJ's rejection of that assessment.

As noted above, the Appeals Council considered the additional evidence of Drs. Cox and Kharidi when denying Plaintiff's request for review.  "Once it is clear that the Appeals Council has considered newly submitted evidence, [the Court] do[es] not evaluate the Appeals Council's decision to deny review.  Instead, [the Court's] role is limited to deciding whether the [ALJ's] determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made."  **Riley v. Shalala**, 18 F.3d 619, 622 (8th Cir. 1994) (alterations added).  "Of necessity, that means [the Court] must speculate to some extent on how the [ALJ] would have weighed the newly submitted reports if they had been available for the original hearing."  **Id.** (alterations added).  Accord **Flynn v. Chater**, 107 F.3d 617, 621-22 (8th Cir. 1997).

The ALJ discounted Plaintiff's testimony based on, inter alia, her failure to see a specialist, as recommended by Dr. Galbraith, and her three-month return to work beginning in April 1999. She did see a specialist, and Dr. Galbraith had the report of that specialist before he completed the disability form. Speculating about the ALJ would have weighed this information, the Court finds that he would have reevaluated Dr. Galbraith's report and Plaintiff's credibility had he the newly admitted evidence.

This Court must also speculate on the significance the ALJ would have attached to the diagnosis of myofascial syndrome, or fibromyalgia. ""Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective issues, can be disabling." **Kelley v. Callahan**, 133 F.3d 583, 589 (8th Cir. 1998). "It often leads to a distinct sleep derangement which often contributes to a general cycle of daytime fatigue and pain." **Id.** The diagnosis of fibromyalgia "is usually made after eliminating other conditions, as there are no confirming diagnostic tests." **Brosnahan v. Barnhart**, 336 F.3d 671, 672 n.1 (8th Cir. 2003). Plaintiff's testimony and her complaints to her physicians and physical therapists are consistent with fibromyalgia.

When evaluating Plaintiff's credibility, the ALJ also noted that she returned to work after injuring her shoulder; however, after three months she reported to Dr. Galbraith that the pain had gotten progressively worse. There is no indication of her having worked again. The ALJ discounted Plaintiff's credibility based on her daily activities and her having taken two long-distance car trips. One was to see a doctor; the other was to see her daughter in Ohio. Plaintiff testified that during the latter trip she had to take breaks and sometimes had to lie

down in the back of their van. Her daily activities consist of cooking, cleaning (performed with breaks), twice-weekly one-destination shopping trips, and occasional social visits. The Eighth Circuit Court of Appeals held in **Brosnahan**, supra, that "in the context of a fibromyalgia case, . . . the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity." **Id.** at 677 (alteration added).

In **Forehand v. Barnhart**, 364 F.3d 984 (8th Cir. 2004), the Eighth Circuit reversed and remanded a claimant's request for DIB. The claimant had fibromyalgia, osteoarthritis in her hands, carpal tunnel syndrome, and dysthymia. **Id.** at 985. The ALJ had rejected her allegations about her limitations, citing, inter alia, her conservative course of treatment, her activities, including caring for her personal needs and doing laundry and other housework, her lack of treatment by a psychiatrist or psychologist, and her report to an examining physician that she was doing "fairly well." **Id.** The ALJ also rejected the opinion of her treating physician that she was disabled, finding it contradicted by substantial evidence. **Id.** at 986. The Eighth Circuit disagreed, finding the opinion consistent with the findings and diagnoses, including fibromyalgia and dysthmia, of the claimant's past physicians. **Id.** at 987. The court also disagreed with the ALJ's assessment of the claimant's credibility, finding her daily activities not to be inconsistent with her fibromyalgia and noting that, although she did not seek psychiatric treatment, she did seek mental health treatment from her treating physician. Similarly, in the instant case, Plaintiff has consulted her health care providers at

the Clinic about her depression and has been prescribed Prozac, contrary to the ALJ's findings.

The medical records of Dr. Kharidi are also relevant to the ALJ's consideration of Plaintiff's lack of strong pain medication as detracting from her credibility. Dr. Kharidi noted that she was taking Vicodin and OxyContin.

The medical records of Drs. Cox and Kharidi weaken the strength of several factors considered by the ALJ when discounting Plaintiff's credibility. The diagnosis of fibromyalgia might also, on further development of the record, weaken the ALJ's assessment of her credibility. In turn, that credibility was instrumental to the determination of her RFC.

## Conclusion

For the foregoing reasons, the Court finds that this case must be remanded to the Appeals Council for remand to the ALJ for further consideration of the diagnosis of fibromyalgia, a reassessment of Plaintiff's credibility, and, if necessary, additional testimony by a VE. See **Garza v. Barnhart**, 397 F.3d 1087, 1089-90 (8th Cir. 2005) (noting that diagnosis of fibromyalgia might require moving around once or twice an hour and remanding case to ALJ for further consideration in light of such diagnosis); **Cox v. Barnhart**, 345 F.3d 606, 608-10 (8th Cir. 2003) (reversing and remanding case to ALJ for reconsideration of treating physician's opinion about claimant's limitations and of claimant's testimony about those limitations in context of fibromyalgia). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED

and this case is REMANDED for further proceedings consistent with this Memorandum and

Order.

An appropriate Judgment shall accompany this Memorandum and Order.


                                        /s/ Thomas C. Mummert, III
                                        THOMAS C. MUMMERT, III
                                        UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of November, 2005.